IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 3, 2019

## STATE OF TENNESSEE v. JESSICA LAUREN SMITH

**Appeal from the Circuit Court for Chester County**
No. 18-CR-37     Kyle Atkins, Judge

_____

### No. W2019-00853-CCA-R3-CD

_____


A Chester County jury convicted the defendant, Jessica Lauren Smith, of felony child neglect, and the trial court imposed a sentence of twenty months in confinement. On appeal, the defendant challenges the sufficiency of the evidence to support her conviction and argues the trial court erred in denying her motion for judgment of acquittal. After reviewing the record and considering the applicable law, we conclude there was insufficient evidence to sustain the defendant's conviction. However, as there was sufficient evidence to sustain a conviction of attempted felony child neglect, we reverse the judgment for felony child neglect, modify the conviction to attempted felony child neglect, and remand for a new sentencing hearing and entry of an amended judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; Case Remanded**

J. ROSS DYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT H. MONTGOMERY, JR., JJ., joined.

G.W. Sherrod III, Henderson, Tennessee, for the appellant, Jessica Lauren Smith.

Herbert H. Slatery III, Attorney General and Reporter; Samantha L. Simpson, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Chadwick R. Wood, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### *Facts and Procedural History*

On October 6, 2017, Rhonda Baker was working for West Tennessee Restoration and was hired to clean the aftermath of recent fire damage to the defendant's house.

Upon entering the residence, Ms. Baker heard someone "banging on a bedroom door" and a child's voice calling, "Mama, mama." The defendant told Ms. Baker that she was going to "get her child ready" to leave, so Ms. Baker and her co-workers could begin cleaning. The defendant then opened the bedroom door, and the victim ran into the living room. Ms. Baker noticed the victim had "matted hair and dirt on her face" but did not appear injured or sick. After the defendant and victim left the residence, Ms. Baker's co-worker discovered a cooking pot filled with urine in the victim's bedroom, and Ms. Baker called her supervisor to report what they had found.

As a result of Ms. Baker's report, Jennifer Maxwell, an investigator with the Department of Children's Services, responded to a request for immediate assistance at the defendant's residence. After observing the victim's bedroom, Ms. Maxwell called the defendant and asked her to bring the victim to the house. When the defendant and victim arrived, Ms. Maxwell noticed "bumps and bruises" on the victim. Specifically, Ms. Maxwell observed "bug bites," "small bruises," "dirt on [the victim's] knees," and "ink marks where [the victim] had drawn on herself." Later that day, Ms. Maxwell gave the victim a bath and fresh clothes because "she did not smell good," and, although Ms. Maxwell attempted to speak with the three-year-old victim, the victim would only say "one or two words." However, when asked about the cooking pot in the bedroom, the victim told Ms. Maxwell, "Pee when Mommy locks."

Inside the residence, Ms. Maxwell noticed a distinct difference between the victim's bedroom and the rest of the defendant's house. The other rooms were "pretty neat" and contained decorations. The victim's bedroom, on the other hand, had exposed wiring and did not have proper flooring. Ms. Maxwell also saw mouse droppings on the floor in the victim's bedroom, which she did not observe in any other room.

Investigator Branson Barnes with the Chester County Sheriff's Department received a call from Ms. Maxwell asking for assistance at the defendant's residence regarding possible child neglect. Upon arriving at the scene, Investigator Barnes gathered statements from Ms. Baker and her co-workers. The defendant and victim arrived a short time later, and Investigator Barnes questioned the defendant about the victim's living conditions. The defendant confirmed that she locked the victim in her bedroom every night from approximately 10:00 p.m. until 6:30 a.m., claiming she did so for the victim's safety. Although Investigator Barnes did not observe the victim to be "significantly injured," he noticed "significant bruises on her legs" and "small scratches" on each arm.

After receiving consent to enter the residence, Investigator Barnes observed the victim's bedroom, which was in "very poor condition." Inside the bedroom, Investigator Barnes observed a mattress leaning against the wall, mouse droppings on the floor, and

"debris" strewn about. Although the carpet had been removed from the bedroom floor, Investigator Barnes noted the tack strips which had been used to secure the carpet to the subflooring were still nailed in place and exposed. Additionally, the locking mechanism on the door knob had been moved to the outside of the bedroom door, allowing the door to be locked from the outside, and, because there was no plumbing in the bedroom, the victim did not have access to a bathroom or water during the times she was locked in the room. On cross-examination, Investigator Barnes acknowledged there was no evidence the victim was injured by anything in her bedroom, including the tack strips or mouse droppings.

The defendant testified on her own behalf and agreed the victim's living conditions were not ideal. However, she claimed that her decision to move the locking mechanism to the outside of the victim's door was done for the victim's safety. The defendant testified she awoke late one night in May 2017 and, after noticing the victim was not in her bed, found her on the back porch playing with her pet rabbit. The victim had apparently climbed through a dog door used by the defendant's two Great Pyrenees. Two weeks later, the defendant again found the victim outside in the middle of the night. At that time, the defendant decided it would be safer to move the bedroom lock to the outside of the door in order to lock the victim in her bedroom during the night. The defendant testified she only locked the victim in her bedroom if the victim stayed up to watch television, but, if the victim fell asleep before the defendant, the door was not locked.

The defendant also admitted to placing the cooking pot in the victim's bedroom for the victim to urinate in. However, the defendant testified this action preceded her decision to lock the victim's door at night. In March 2017, although the victim was potty-trained, she began having accidents after she and the defendant moved in with the defendant's boyfriend. The defendant discovered spots of urine in the victim's bedroom, and, following several incidents, the defendant removed the carpet in the bedroom to get rid of the smell. However, because the victim continued urinating in her bedroom, the defendant placed the cooking pot in the room to encourage the victim to stop. The defendant acknowledged this was a "stupid decision" and stated she should have purchased a "potty chair" for the victim when the accidents began.

The defendant disputed Ms. Maxwell's testimony that the victim had a speech problem and argued it was more likely the victim was in shock after being taken away from the defendant. Regarding the bruises and scratches on the victim, the defendant testified the victim loved to play outside with their dogs, and, because she was a "normal kid," the victim sometimes fell down or got hurt playing with the dogs.

On cross-examination, the defendant acknowledged she had alcohol in her purse when the victim was taken from her. The defendant admitted drinking regularly but denied drinking to excess on a regular basis.

Following deliberations, the jury found the defendant guilty of felony child neglect, and the trial court subsequently sentenced the defendant to twenty months in confinement. The defendant filed a motion for new trial in which she argued, in part, the evidence at trial was insufficient to support the jury's verdict. The trial court denied the motion, and this timely appeal followed.

## *Analysis*

On appeal, the defendant argues the evidence at trial was insufficient to support her conviction for felony child neglect. She further argues the trial court erred when it denied her motion for judgment of acquittal. Specifically, the defendant contends the evidence does not show the defendant's neglect produced an actual, deleterious effect or harm upon the victim's health or welfare as required in *State v. Mateyko*, 53 S.W.3d 666, 670-71 (Tenn. 2001). The State contends the evidence was sufficient to support the defendant's conviction.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the following rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human

atmosphere, and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

This Court has previously said that "[i]n dealing with a motion for a judgment of acquittal, unlike a motion for a new trial, the trial judge is concerned only with the legal sufficiency of the evidence and not with the weight of the evidence." *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). Therefore, when reviewing the denial of a motion for judgment of acquittal, we apply the same standard employed when reviewing the sufficiency of the evidence after a conviction has been imposed. *See State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998).

As charged in this case, child neglect occurs when a person "knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare." Tenn. Code Ann. § 39-15-104(b). "[I]f the abused or neglected child is eight (8) years of age or less, the penalty is a Class E felony." *Id.* To convict the defendant of child neglect, "the State [must] show something more than a risk of harm to a child's health and welfare." *Mateyko*, 53 S.W.3d at 671. "[T]he State must show that the defendant's neglect produced an actual, deleterious effect or harm upon the child's health and welfare." *Id.* at 671-72.

Here, while the testimony reflected that the victim had scratches and bruises, no evidence was presented regarding their cause, and the testimony conflicted regarding their severity. The victim also had bug bites on her arms and legs; however, there was no testimony that she suffered any physical harm from the bug bites. Although Ms. Maxwell testified the victim had trouble speaking clearly and forming complete sentences, she was unable to testify whether this impairment was caused by the defendant's neglect. Furthermore, although witnesses described the victim as dirty and the victim's bedroom as cluttered and filled with potentially dangerous objects, the State provided no proof that the defendant's neglect of her housekeeping duties or the victim's hygiene caused an "actual deleterious effect or harm upon the [victim's] health and welfare." *Id.* at 672. Accordingly, we reverse and vacate the defendant's conviction of felony child neglect. *See id.* at 668 (holding the victims suffered no harm when a baby was found in a pile of trash and clothes, children were sleeping under a "roach-infested blanket," and an officer had to go outside to "breathe fresh air and to shake the roaches off his pants"); *State v. Christopher Collins*, No. M2009-01674-CCA-R3-CD, 2011 WL

346433, at *4 (Tenn. Crim. App. Feb. 4, 2011) (finding insufficient proof to support the defendant's convictions for child neglect when the State failed to prove the defendant's neglect caused the cuts and scrapes found on the victims or that their severe head lice infestations caused physical harm), *no perm. app. filed*.

Nevertheless, we conclude the evidence was sufficient to sustain a conviction of the lesser-included offense of attempted felony child neglect. In *Mateyko*, our supreme court examined the elements of attempted child neglect and held that "the State must prove that the defendant intentionally engaged in conduct constituting child neglect or that [her] conscious objective or desire was to neglect [the victim]." *Mateyko*, 53 S.W.3d. at 676 (citing Tenn. Code Ann. § 39-11-302(a)). Additionally, the State must prove "that the defendant took a substantial step toward the commission of that offense." *Id.* at 673. Because child neglect "is principally a nature-of-conduct offense . . . the State has no burden . . . to show that the defendant intended that [the victim] suffer adverse effects to [her] health and welfare." *Id.* at 676-77.

Although in *Mateyko* the supreme court remanded the case for a new trial because the evidence supporting an attempted child neglect conviction was conflicting, we believe remand is unnecessary in this case. At trial, the defendant testified and admitted to locking the victim in her bedroom at night and forcing her to urinate in a cooking pot. The defendant also admitted to removing the carpet in the victim's bedroom and leaving the tack strips exposed. Ms. Maxwell testified the condition of the victim's bedroom was noticeably worse than the other rooms in the house, and the bedroom contained exposed wiring and mouse droppings. Additionally, Ms. Maxwell testified the victim was dirty and "did not smell good." In reviewing the record, the evidence presented at trial showed a continual attempt by the defendant to neglect the victim by failing to provide a safe, sanitary, and adequate living environment for her and by failing to provide for the victim's personal hygiene needs. While the conditions of the victim's bedroom were reprehensible, she was removed from this environment before any harm occurred. Therefore, we conclude the defendant's "conscious objective or desire was to neglect" the victim and the defendant took a substantial step toward achieving her objective. *Id.* at 676. Accordingly, we modify the conviction to attempted felony child neglect, a Class A misdemeanor, and we remand the defendant's case for a new sentencing hearing.

### *Conclusion*

For the aforementioned reasons, we reverse the judgment for felony child neglect, modify the conviction to attempted felony child neglect, and remand for a new sentencing hearing and entry of an amended judgment.

_____
J. ROSS DYER, JUDGE